BANGS MILLING COMPANY, Appellant, v. BURNS et al.; PIGGOTT, Interpleader.

### Division One, November 14, 1899.

1. **Attachment:** FRAUDULENT CONVEYANCES TO DEBTOR.   In a suit by an attachment creditor to set aside a deed of trust made by the debtor for the benefit of certain other creditors, he can not complain of fraudulent conveyances made *to* the debtor but only of those made *by* him.

2. ———: ———: VENDOR'S RIGHT.   Though it may be shown that the *cestui que trust* in the chattel deed aided the maker thereof in purchasing a large stock of goods just prior to the execution of the trust deed, by giving him a fictitious credit, and this was fraudulently done for the purpose of cheating the attaching creditor, yet this does not justify the setting aside of the chattel deed.   Each defrauded vendor, if he could show that he was induced by fraud to make the sale, could pursue the identical goods sold and recover them.   Or he could sue all the parties participating in the fraud by direct action for damages.   But by bringing an attachment he affirms his sale of the goods, and is in no positison to say that they were fraudulently bought, for the basis of said action is that he is a general creditor under a *bona fide* sale.

3. ———: ———: NATURE OF ACTION.   A suit to set aside a deed of trust made by an insolvent debtor to hinder, delay and defraud his creditors, is an action which by the statute plaintiff may engraft upon his suit by attachment upon an account for the purchase price of the goods sold by him.

4. ——— : ——— : PREFERENCE: MAKING NOTE LARGER THAN DEBT. The maker of a deed of trust for the benefit of preferred creditors owed an overdraft at the bank of one of them for $8,530.55, and a note to cover this amount was executed for $9,000 and the difference, $469.45, was placed to the maker's credit. Besides this debt the maker owed the bank and the other preferred creditors $48,000 in notes, and the entire property conveyed to the trustee amounted to $43,000. *Held*, that as the making of this note for $9,000 instead of for $8,530.55 did not withdraw from other creditors property or money which, but for that act, they could have subjected to the payment of their debts, the deed of trust was not for that reason void.

5. **Fraudulent Conveyance** : PURPOSE OF STATUTE. The sole purpose and object of the statute concerning fraudulent conveyances is to secure the appropriation of the debtor's property to the payment of his debts; not all his debts, but such part thereof as he prefers to pay.

6. ——— : WHEN NOT FRAUDULENT. A conveyance by the insolvent debtor that subjects his property to the payment of an honest debt is not fraudulent as to other creditors.

7. ——— : FICTITIOUS DEBT. Where the evidence is insufficient to sustain the claim that the debt named in the deed of preference is fictitious, it is not error to refuse an instruction submitting that issue to the jury.

8. ——— : OTHER CONVEYANCES TO RELATIONS: INTENT. It is not competent, in a suit to set aside a deed of trust for the benefit of certain preferred creditors therein named, to show that the same debtor about the same time made a conveyance of other property to his children which was in fraud of the rights of his general creditors, unless such evidence would tend to show that the indebtedness mentioned in the deed sought to be set aside was not honest or genuine, or that the value of the property therein conveyed exceeded the amount of the debt.

9. ——— : EVIDENCE: ADMISSIONS: TESTIMONY IN ANOTHER CASE. The testimony of the president of a bank in a cause to which the bank was not a party, can not be used in a subsequent suit to which the bank is a party as an admission against the bank.

*Appeal from the Clinton Circuit Court.*—HON. WILLIAM S. HERNDON, Judge.

AFFIRMED.

W. K. Amick, F. M. Black and Johnson, Rusk & Stringfellow for appellant.

(1) There are many circumstances which, if taken separately, would not be deemed sufficient evidence of fraud, but when taken in their combinations furnish an abundance of evidence to send the case to the jury. All the circumstances must be taken collectively. Wait on Fraud. Conv., sec. 224; State to use v. Mason, 112 Mo. 382. (2) The court erred in excluding the evidence of Stephen J. Burns, relating to the transactions with Sibbald and his wife. It is competent, in order to establish the fraudulent intent of the debtor, to give evidence of other fraudulent sales effected about the same time. Wait on Fraud. Conv., sec. 282; Erfort v. Consalus, 47 Mo. 209; Lincoln v. Claflin, 7 Wall. 132. (3) Whilst a creditor may take property from the debtor in payment of or security for his debt, though he may know that the debtor intends thereby to defraud his other creditors, still he must stop there. If a sale or mortgage be made for the further purpose of securing to the debtor any money or property, the transaction is fraudulent. Alberger v. White, 117 Mo. 363; McVeigh v. Baxter, 82 Mo. 518; Meyberg v. Jacobs, 40 Mo. App. 136; Levy & Co. v. Williams, 79 Ala. 136; Oppenheimer v. Halff, 68 Tex. 409. (4) Though a conveyance may have been made for a valuable consideration, or a mortgage may have been made to secure a valid debt, still it may be and often is fraudulent as to creditors. Nat. Tube Works Co. v. Machine Co., 118 Mo. 375; Dougherty v. Couper, 77 Mo. 529; Sexton v. Anderson, 95 Mo. 379; Craig v. Zimmerman, 87 Mo. 478; State v. Purcell, 131 Mo. 318; Johnson v. Sullivan, 23 Mo. 482; Murray v. Cason, 15 Mo. 379. (5) If a part of the consideration for a conveyance is fraudulent, the entire transaction is vitiated. Nat. Tube Works Co. v. Machine Co., 118 Mo. 376; State ex rel. v. Hope, 102 Mo. 410; Boland v. Ross, 120 Mo. 208; Simon Gregory Dry Goods Co.

v. McMahon, 61 Mo. App. 500; Barton v. Sitlington, 128 Mo. 174: (6) While an insolvent debtor has himself a right to prefer one creditor over another, still he can not delegate the right to give a preference to a third person. The exercise of such delegated power by a preferred creditor is a badge of fraud, and is strong evidence of his participation in the fraudulent scheme. Sigers Sons v. Thomas Bros., 107 Mo. 643; Hamill v. England, 57 Mo. App. 106; Meyberg v. Jacobs, 40 Mo. App. 129. (7) The court erred in excluding the evidence of Calvin F. Burnes. The declarations or admissions of the president of a corporation are admissible in evidence against the corporation in cases where he is the official mouthpiece in dealing with the public, and especially where they are made in respect of some business for the corporation, with which the president is charged at the time of making them. 4 Thompson's Com. on Corp., 4656, 4915; Malacek v. Railroad, 57 Mo. 17; Costigan v. Michael Transportation Co., 38 Mo. App. 219; Texas Standard Cotton Oil Co. v. National Cotton Oil Co., 40 S. W. Rep. 159; Harnett v. Westcott, 24 J. & S. 213. The president of a bank is not a mere agent but is a vice-principal. Bank v. Armstrong, 76 Fed. Rep. 345; Railroad v. Coleman, 18 Ill. 297.

BROWN & DOLMAN, VINTON PIKE and WILLARD P. HALL for respondent.

(1) Plaintiff can not complain here of fraud by Burns & Company in obtaining the attached property. (a) In the very nature of things one's creditor can not complain because he acquires property. Fenton v. Adler, 24 How. 407. And such is the law still except where it has been changed by statute. (b) The statute on fraudulent conveyances was intended for the protection of creditors to the extent of making void as against them conveyances by their debtors intended to hinder, delay and defraud them in the collection of their

debts, but conveyances to debtors are not affected by that statute. (2) If one fraudulently purchases goods from another, intending at the time not to pay for them, the fraudulent purchaser's title to the goods is not void, but is valid, subject only to the right of the defrauded vendor to rescind the sale and reclaim the goods. The purchaser's title is not void till affirmed, but is valid until disaffirmed by the vendor. 1 Bigelow on Fraud., pp. 73, 74; Lapp v. Ryan, 23 Mo. App. 436; Upton v. Englehart, 3 Dill. 496; Mapes v. Burns, 72 Mo. App. 422. (3) Till rescision by the vendor, the purchaser may treat the property as his own in all respects; he may sell it, he may give it away, or he may transfer it in payment of his debts, subject, of course, but subject alone, to the vendor's right to afterwards rescind the sale and to claim the goods, except they shall in the meantime have been transferred to a *bona fide* purchaser for value and without notice. Walker v. Collins, 50 Fed. Rep. 742; Mapes v. Burns, 72 Mo. App. 422. (4) And all this is true against all general creditors alike without regard to the origin of their indebtedness. The fact that a creditor's debt was created through fraud is wholly immaterial. He has absolutely no more or other interest in his debtor's property than any other creditor. Peters v. Bain, 10 Sup. Ct. Rep. 357. (5) The fact that one participates with another in the fraudulent purchase of goods, with the intent then had, not to pay therefor does not incapacitate him from purchasing the goods from the fraudulent vendee. He has exactly the same right to purchase the goods that any one else with notice of the fraud has. State to use v. Schulein, 45 Mo. 521. (6) Therefore, if Burns & Company, in pursuance of a conspiracy between them and the National Bank of St. Joseph and Ayr Lawn Company, did purchase the attached property, with the intent then had not to pay therefor and to turn the same over to said bank and Ayr Lawn Company on account of the indebtedness owing by Burns & Company to them, and afterwards did turn over said

property to them on account of said indebtedness, the transaction was not fraudulent as against the general creditors of Burns & Company.    Donald v. Constant, 82 Ind. 212; Goodall v. Stewart, 3 So. Rep. 257; Bach v. Tuch, 26 N. E. Rep. 1019; Gray v. St. John, 35 Ill. 222; Walker v. Collins, 50 Fed Rep. 737; Millington v. Hill, 47 Ark. 309; Bank v. Frank, 37 So. Rep. 400; State to use v. Schulein, 45 Mo. 521; Baurman v. Van Buren, 44 Mich. 499; Stokes v. Burns, 132 Mo. 214; Mapes v. Burns, 72 Mo. App. 421.    (7)   Payment by the bank of the difference between the amount of the overdraft and the $9,000 note at any time prior to levy under attachment to any *bona fide* creditor of Burns & Company cured the transaction of any impropriety caused by loaning them the amount of said difference and depositing same to their credit. If it be conceded for the purposes of the argument that the placing by the bank on its books to the credit of Burns & Company of that portion of the $9,000 loan which was in excess of the overdraft was a wrong against the creditors of Burns & Company of which they could have complained, because said excess was subject to be checked out of the bank by Burns & Company for their own personal use as contra-distinguished from the use of their creditors, still the plaintiff was not at the time of the institution of this action in a position to complain on account of said fact, because at that time said excess had been paid out on checks of Burns & Company to their creditors, and the wrong, if wrong there was, incident thereto, had been cured, and the transaction was purged thereof.    Jones on Ch. Mort., sec. 178; 2 Cobby Ch. Mort., sec. 794; Dobyns v. Meyer, 95 Mo. 132; Mahoney v. McWalters, 38 N. Y. Sup. 256; Murphy v. Briggs, 89 N. Y. 446.    (8)   There was no fraud against the creditors of Burns & Company in the bank loaning the latter a few hundred dollars more than the overdraft, even if it afterwards paid said excess to them because the amount of the indebtedness existing before said new loan was made greater in amount than the entire value of all the

security received by both the bank and the Ayr Lawn Company. (a) If the result of any given transaction, where a debtor seeks to prefer one of his creditors, is the transfer to the creditor of the debtor's property an amount less in value than the amount honestly owing there can, as a matter of law, be no fraud in it. Scarborough v. Hilliard, 28 S. W. Rep. 231; Freyble v. Tierman, 13 S. W. Rep. 370; Sawyer v. Bradshaw, 17 N. E. Rep. 812; Goetter v. Norman, 19 So. Rep. 56; Adkins v. Bynum, 19 So. Rep. 400; Oppenheimer v. Halff, 4 S. W. Rep. 562; Marshall v. Hutchinson, 5 B. Mon. 298; Bent v. Bent, 3 N. Y. Sup. 750; Albee v. Webster 16 N. H. 362; Slater v. Dudley, 18 Pick. 372; Vial v. Mathewson, 34 Hun. 70; Griffin v. Cranston, 1 Bos. 281; s. c., 10 Bos. 1; Brinson v. Edwards, 10 So. Rep. 219; Bank v. Marshall, 23 S. W. Rep. 6; Cleveland v. Empire Mills, 25 S. W. Rep. 1055; Phillips v. Shwellokolf, 29 S. W. Rep. 645; Bank v. Steere, 43 N. E. Rep. 187; Smith v. Riggs, 56 Ia. 488; Sommerville v. Horton, 26 Am. Dec. 242; Covanhoven v. Hart, 21 Pa. St. 495; Henderson v. Perryman, 22 So. Rep. 24; Dallman v. Renshaw, 26 Mo. 88; Stokes v. Burns, 132 Mo. 214. (b) There can, under the statute, be no fraud without a dishonest intent, but fraud does not consist in mere intention, but in intention carried out by hurtful action. Bump on Fraud. Conv. (3 Ed.), p. 19; Bunn v. Ahl, 29 Pa. St. 387; Williams v. Davis, 69 Pa. St. 21; Rice v. Perry, 61 Me. 145; Carter v. Coleman, 4 So. Rep. 151; Adkins v. Bynum, 19 So. Rep. 400; Hoyt v. Godfrey, 88 N. Y. 669.

ROBINSON, J.—During the middle and latter part of February, 1892, the plaintiff in this case, together with some sixteen other creditors of Stephen J. Burns & Company, began suits by attachment, and levied upon and seized certain property in the hands of the interpleader herein, Harry S. Piggott, as the property of said Stephen J. Burns & Com-

pany.  Piggott filed his interplea, claiming the property so seized under a deed of trust executed by the defendants Stephen J. Burns & Company of date February 10, 1892, in which he was named as trustee, and the National Bank of St. Joseph, Missouri, and the Ayr Lawn Company, other creditors of said Stephen J. Burns & Company, were named as the beneficiaries.  To the interplea thus filed by Piggott the plaintiff filed the following answer:

"Plaintiff for answer to interplea of Harry Saxton Piggott in the above entitled cause admits that it brought the attachment and levied upon the property mentioned in said interplea, and denies each and every other allegation in said interplea contained.

"Further answering said interplea, plaintiff states that on or about the date this attachment was filed, the following parties filed in the office of the clerk of the circuit court of Buchanan county, Missouri, their several attachment suits against the defendants herein for amounts respectively as follows, to wit:

| | |
|---|---:|
| Rush & Sprague | $ 2,944 83 |
| Kelly & Lysle Milling Co. | 5,523 57 |
| Bangs Milling Co | 3,052 11 |
| W. H. Stokes | 3,674 50 |
| J. H. Mapes | 418 60 |
| Stillman, Wright & Co. | 1,410 00 |
| The Crosby Roller Mill Co. | 2,099 63 |
| Wagner & Gates Milling Co | 10,417 79 |
| R. D. Hubbard | 4,406 10 |
| Platte City Mill Co | 660 00 |
| Lexington Mill & Elevator Co | 1,634 00 |
| Bowersock Milling Co. | 465 00 |
| Wm. Pollock Mill & Elevator Co | 1,778 49 |
| B. F. Harpster | 712 20 |
| Hoffman & Son | 1,130 00 |
| Wamego Mill Co | |
| Glasgow Milling Co. | $ 1,371 55 |

"The affidavits for attachment in said several suits alleged grounds substantially the same as those alleged in this suit, and that at the time this attachment was sued out, defendants were indebted to plaintiff herein in the sum of three thousand and fifty-two dollars and eleven cents. To said other parties above named in the amounts herein above set opposite their names respectively:

"To Salina Mill & Elevator Co. for about $22,000.

"To Combe Printing and Lithographing Co. for about $800.

"To Cain Milling Co., for $1,312.47.

"To various other parites in sundry amounts; all for merchandise recently theretofore by them bought and procured by means and in pursuance of, the fraudulent scheme herein set out.

"Plaintiff states that defendants did on the 10th day of February, 1892, execute a certain deed of trust in the nature of a mortgage to Harry Saxton Piggott, party of the second part, trustee for Ayr Lawn Company and National Bank of St. Joseph, parties of the third part, on certain property described as follows, to wit:

"All of the grain and stock of material now on hand in the mill and warehouse of said first party, together with all flour, oatmeal and other goods, wares or merchandise now in and about said mill and warehouse, situated on lots one, two, three, four, five and six in block twenty-six, Robidoux's addition; also forty car loads of flour, more or less, stored in said mill and warehouse the following described personal property, to wit, about 5,000 wood knocked down boxes, about 300,000 paper boxes, about 5,000 labels 'St. Joe Flake,' about 5,000 labels 'Aunt Sally;' about 20,000 empty sacks, about four car loads of feed, a lot of wheat flour and self-rising buckwheat, two desks, one safe, three wagons, two mules, one elevator, one truck, scales, one wagon scales, eight small scales, also about six car loads of flour stored in the building known

as No. 615 South Seventh street, being the same building once occupied by Condon-Riley & Company, situated on the east side of Seventh street about 200 feet south of Messaine street, also about eighteen car loads of flour stored in the building at northeast corner of Third and Charles streets, known as the Riley building, all of said property being in the city of St. Joseph, Buchanan county, Missouri.

"And that this deed of trust in the nature of a mortgage contained among others, the following provisions, to wit: 'The possession of all said property is now herewith given said party of the second part with power and authority to hold, manage control and change the form thereof, and sell or otherwise convert the same into money in any way or manner that to said second party may seem necessary or advisable for the interest of all parties concerned, and all changes and moneys arising from any act of the said second party, shall be held by him subject to the trust hereinafter mentioned as though no change had been made.'

"And the only defeasance clause in said deed is as follows. 'Now, therefore, if the said party of the first part, or any one for him, shall well and truly pay off and discharge the debt and interest expressed in said notes, and every part thereof, when the same becomes due and payable according to the true tenor, date and effect of this instrument on the day that the last of said notes becomes due and payable, being the 10th day of April, the time for payment of said notes is herewith extended to said 10th day of April, 1892, then this deed shall be void, and the property hereinbefore conveyed shall be released at the cost of the said party of the first part; but should the party of the first part fail or refuse to pay the said debt, or the said interest or any part thereof when the same or any part thereof shall become due and payable according to the true tenor, date and effect of this deed of trust, on the 10th day of April, 1892, as aforesaid, then this deed shall remain in force.'

"The said trustee, Harry Saxton Piggott, immediately upon the execution and delivery of said deed of trust in the nature of a mortgage, took possession of all said property so conveyed and retained possession thereof until it was taken from him by the sheriff of Buchanan county under the several writs of attachment issued at the instance of the several attaching plaintiffs above named.

"Plaintiff states that the defendants, Burns & Company, did on the 10th day of February, 1892, execute a certain deed of trust in the nature of a mortgage in which Jefferson Hosea was party of the second part, trustee for Ayr Lawn Company, party of the third part, upon the following property, to wit: Lot.number nine in block thirty-three original town now city of St. Joseph, subject however, to deed of trust heretofore made by said party of the first part; also a certain. leasehold estate, being the lease on lots one, two, three, four, five and six in block twenty-six, in Robidoux's addition, an addition to the city of St. Joseph, and being the same property now occupied by said party of the first part by virtue of the terms of the lease executed June 8th, 1889, by the Chicago, St. Paul & Kansas City. Railway Company to said first party, recorded in book 194, page 520, in the office of the recorder of deeds of Buchanan county, together with all the appurtenances, fixtures, machinery and miller's outfit thereon situated, part of which machinery is subject to a deed of trust of chattel mortgage heretofore made.

"The said property was the mill lately conducted by defendants, Burns & Company, and that the said deed of trust in the nature of a mortgage contained among others the following provisions, to wit:   'Now, therefore if the said party of the first part, or any one for him, shall well and truly pay off and discharge the debt and interest expressed in said note and every part thereof, on or before the 10th day of April, 1892, to which time payment of said note is extended, then this deed shall be void and the property hereinbefore con-

veyed shall be released at the cost of the said party of the first part; but should the party of the first part fail or refuse to pay the said debt or the said interest or any part thereof, when the same or any part thereof shall become due and payable according to the terms of this deed of trust, then the whole shall become due and payable, and this deed shall remain in force,' which provision is the only defeasance in said deed.

"That the pretended debt apparently evidenced by the notes mentioned in said deed was wholly fictitious.

"Said trustees, Harry Saxton Piggott and Jefferson Hosèa, immediately upon the execution and delivery of said deeds of trust, took possession of all said property so conveyed and retained possession thereof until it was taken from them by the sheriff of Buchanan county under the several writs of attachment aforesaid.

"That on the 9th day of February, 1892, said Stephen J. Burns and Martha Burns, his wife, conveyed to John E. H. Sibbald, trustee for one William J. Hunter, lot nine in block forty-four in the original town, now city of St. Joseph, Missouri. That said deed purported to be given to secure an indebtedness of thirty-five hundred dollars, but it was in fact wholly voluntary and is only a part of the fraudulent schemes and designs herein set out.

"That defendants by voluntary and fraudulent conveyance, conveyed away, and by other fraudulent means concealed all the rest of their property in furtherance of and as a part of the fraudulent scheme herein set out.

"That all said conveyances were made by defendants with the design to hinder, delay and defraud their creditors and among others this plaintiff, all of which was well known to and participated in by said trustees and cestuis que trust.

"Plaintiff states that about ninety days before the filing of said deeds, defendants, Burns & Company, in furtherance of designs previously formed to defraud this plaintiff and others, began buying and did buy then and thereafter con-

stantly up to the 10th day of February, 1892, large quantities of flour and other merchandise, including that on which the said debt of plaintiff is founded, amounting in value in all to over eighty thousand dollars.

"That said flour and other merchandise were bought on credit, without any intention on the part of Burns & Company of paying for the same, and in quantities much beyond their ability to pay for, and with the purpose and design of converting the same to their own use, and to the use of the interpleader and the other parties to the deeds of trust hereinbefore set out.

"That the trustees and *cestuis que trust* in the deeds of trust herein, were well aware of said purpose and design of defendants and aided in and abetted them in carrying same into execution. That said trustees and *cestuis que trust* knew that large quantities of flour and other merchandise were being received as aforesaid, by said Burns & Company, and that the purpose and intention of said firm was to convert it and turn it over to them, which said purpose and intention was consummated by turning over the said flour and other merchandise to the Ayr Lawn Company, National Bank of St. Joseph, Jefferson Hosea, Harry Saxton Piggott, this interpleader, John E. H. Sibbald and William J. Hunter, the trustees and *cestuis que trust* aforesaid, who together with their agents in that behalf well knew when said flour and other merchandise was being purchased, that the sellers thereof were not to be paid therefor, and who, when they took the same for their suppositious indebtedness, well knew that said flour and other property had not been paid for.

"It is a fact and was known by said trustees and *cestuis que trust* so to be that during said ninety days, defendant Burns & Company, although having on hand large quantities of flour and other merchandise largely in excess of the needs of their business and in excess of what said firm usually carried, or the market required, were by letter, telegram and other-

wise hurrying forward said flour and other merchandise in pur-
suance of said fraudulent design of getting the same into their
possession before the claim therefor matured, in order to en-
able them to convert and wrongfully appropriate it as afore-
said. And further aiding and abetting defendants' design
and fraudulent scheme aforesaid, the Ayr Lawn Company,
National Bank of St. Joseph, Jefferson Hosea, Harry Saxton
Piggott and John E. H. Sibbald, demanded, accepted and re-
ceived from common carriers and others in St. Joseph, flour
and other merchandise shipped to said Burns & Company,
which reached St. Joseph after the execution and delivery of
the conveyances hereinbefore set forth, and after the delivery
to said trustees of the possession of the property transferred
by said deeds.

"That said Burns & Company were during said ninety
days, and for a long time prior thereto had been, customers of
said National Bank of St. Joseph, which was and during all
said times had been familiar with the business affairs, and es-
pecially with their financial transactions and conditions; and
further abetting the fraudulent scheme of defendants, and
their intent and design to hinder, delay and defraud their
creditors, the said bank concealed their financial condition and
gave them a fictitious standing, and thereby induced creditors
among others, this plaintiff, to extend credit to the defendants.

"That about thirty days before the filing of said deeds,
defendants still further carrying out said fraudulent scheme,
put said John E. H. Sibbald into possession of a large amount
of flour and other merchandise procured by them as aforesaid,
and induced him to pretend to be carrying on business in that
line, whereas, he was in fact aiding said Burns & Company
in carrying out said fraudulent scheme, and they did, through
him, dispose of large quantities of flour and other merchandise
for cash and on credit for the purpose of putting said flour and
other merchandise and the proceeds thereof beyond the
reach of this plaintiff and other creditors, and to hinder, delay

and defraud them in the collection of their debts. That said Sibbald, who is a son-in-law of defendants, took part in this scheme and with the knowledge and collusion of said other trustees and beneficiaries opened· up a pretended business in said line in St. Joseph, Missouri, and aided defendants in the manner above set forth in carrying out their fraudulent scheme aforesaid.

"The said Ayr Lawn Company and National Bank of St. Joseph, have substantially the same stockholders, directors and officers and are under the same control and management.

"That the trustee, Jefferson Hosea, named in said deed of trust hereinbefore set forth, is an attorney at law connected with the firm of Spencer, Burns & Mosman, who are attorneys for, and interested in the National Bank of St. Joseph, and Ayr Lawn Company, and are and were attorneys for defendants.

"The said trustees, Jefferson Hosea and Harry Saxton Piggott were not nor was either of them by the terms of the instrument creating their trusts, required to give any bond for the faithful performance of said trusts, and they are and were irresponsible, incompetent and inexperienced in the conduct and management of the business intrusted to them, and in the sale and disposition of the property conveyed to them by the deeds aforesaid.

"That in connection with the business of Burns & Company, and among the assets of said firm, were many valuable accounts, bills receivable and other choses in action; that the books in which the same are recorded and kept, have been spirited away and concealed by said Burns & Company, in furtherance of said fraudulent scheme and designs, and with the knowledge and collusion of said trustees and beneficiaries, and although demand and diligent search for the same have been made by the sheriff, he has not been able to find them.

"Plaintiff states that in truth, no consideration for said deeds passed from said Ayr Lawn Company, The National Bank of St. Joseph, John E. H. Sibbald, Jefferson Hosea, and Harry Saxton Piggott or William J. Hunter, or either of them, but that said conveyances were fraudulent and without any consideration and were made for the purpose of hindering, delaying and defrauding the creditors of said Burns & Company, of which purpose the Ayr Lawn Company, The National Bank of St. Joseph, Jefferson Hosea, Harry Saxton Piggott, John E. H. Sibbald and William J. Hunter, each and all were fully conversant at the time said conveyances were made.

"That any possession of the goods herein claimed by the interpleader which the interpleader held for or as agent or otherwise was in consummation of and a part of the fraudulent scheme and design hereinbefore set out.

"Wherefore, plaintiff prays that the property levied on as aforesaid be held to its said attachment, and for all proper relief."

To this answer the interpleader filed a reply, which will be unnecessary to detail at this time, further than to say all allegations of fraud on part of the trustees, and the beneficiaries are denied.

As was suggested, this is one of a series of suits, involving about the same state of facts that have grown out of the levy and seizure by numerous creditors of Stephen J. Burns & Company, of property in the possession of the interpleader herein, Harry S. Piggott. One of those cases, Stokes v. Burns, Piggott, interpleader, has been tried and on appeal to this court the judgment in favor of the interpleader in the circuit court was affirmed. [See report of case in 132 Mo. 214.] Another, that of Mapes v. Burns, Piggott, interpleader, was tried and taken on appeal to the Kansas City Court of Appeals where a like judgment in favor of the interpleader was affirmed. [See 72 Mo. App. 411.]

It would seem that the disposition of the two last named cases ought to have settled all the questions that should have arisen in the trial of the issues involved between the interpleader and the various attachment creditors of Burns & Company, and have put an end to further contention over the property involved, as it appears by the record herein that like answers were filed by all the creditors, and that they have and did join forces in making a common fight against the claim of the interpleader. Such, however, has not been their effect, according to the action of the present appellant creditor and others who still have appeals pending in this court undisposed of. In our opinion, as in that of the trial court before whom this case was heard, we think no new facts were developed in the Stokes and Mapes cases, *supra*, that would have justified the submission of the case to the determination of the jury, or have called for a different conclusion from that reached in those cases. In fact, it is conceded that the testimony in the Mapes case, and the testimony on the present case are identical in all particulars, and for that reason a general statement as to the facts in this case will be omitted, and such facts given only as will become necessary to mention during the discussion of the proposition now asserted by appellant:

In the Stokes case, plaintiff's chief contention was that if the conspiracy was as alleged in his answer, it not only rendered the purchase of the flour and provisions by Burns & Company voidable at the election of the defrauded vendors, but also in some manner incapacitated the bank and the Ayr Lawn Company from taking said flour from Burns & Company as against their general creditor.

In that case, although the answer charged that the debts of the bank and Ayr Lawn Company were fictitious and dishonest, little or no effort was made to establish that allegation, except to argue that proof of the fraudulent participation by the bank and Ayr Lawn Company, with Burns & Company, in the purchasing of said flour from plaintiff and others, had a

tendency to prove the alleged indebtedness to them secured by the deed of trust, was both fictitious and dishonest. The proof failing, on the question as to the want of honesty and genuineness of the indebtedness by Burns & Company to the bank and the Ayr Lawn Company, secured by the Piggott deed of trust, this court in that case announced the rule, that in actions of this character, an attachment creditor can not complain of fraudulent conveyances to his debtor, but only of fraudulent conveyances by him, and that proof of fraudulent conveyances to him has no tendency in and of themselves to prove that any given conveyance by him was fraudulent, and found against the chief theory upon which the plaintiff at that time predicated his right to recover, and affirmed the judgment in favor of the interpleader.

In this case while not so much effort was made or time spent to prove fraud on the part of Burns & Company in the original purchase of the flour in controversy, or to prove the conspiracy set up in the answer, between Burns & Company and the officers of the bank and the Ayr Lawn Company, or any participation therein by the bank and the Ayr Lawn Company, and more time was given in an attempt to show that there was actual fraud in the conveyance by Burns & Company to the interpleader for the use of the bank and Ayr Lawn Company, appellant still contends that the testimony that was offered tended to prove the fraud on part of Burns & Company in the purchase of the flour, and was also offered as showing the participation in that fraud by the bank and the Ayr Lawn Company, and that these facts in some way operate as an impeachment of the honesty of the indebtedness held by those two institutions against Burns & Company, so far as same affect their attachment creditors.

If it be conceded that Burns & Company did purchase large quantities of flour of the plaintiff herein, and others, not intending at the time to pay therefor, we fail to find in this record any fact or facts, or circumstances from which the fact

by legitimate inference could be deduced, tending to show that the officers of the bank or the Ayr Lawn Company knew of such intended fraud on part of Burns & Company, or that they or any of them participated in said fraud; or that they or either of them loaned money to the firm of Burns & Company, in order to advance their credit with the millers throughout the country, from whom the firm was buying flour, that larger purchases might thereby be more easily accomplished, or that they in any other way aided, knew of or participated in the fraud of said Burns & Company.

If, however, the doctrine announced in the Stokes case is it be adhered to, then all that part of plaintiff's answer, as well as the testimony offered in the attempt to show the knowledge of and participation by the bank and the Ayr Lawn Company in the fraud committed by Burns & Company in the original purchase of the flour in controversy, was improper in this character of a suit. If the officers of the bank and the Ayr Lawn Company knew of and assisted Burns & Company in perpetrating a fraud upon their various customers by representing them to be of good financial standing and otherwise aided them by giving to them a standing and rating that they were in no wise entitled to, whereby they were enabled to buy up the large quantity of flour (that afterwards found its way into the hands of Piggott for the use of the bank or the Ayr Lawn Company) as against the general creditors of Burns & Company, they were not incapacitated from afterwards purchasing said flour or taking it as security for valid debts due and owing to them; and in this character of an action those questions do not properly arise, and the recitation of the existence of those facts by plaintiff in its answer, and the attempted proof of their existence were both useless and unavailing. Each lot of flour after it was purchased, was the property of Burns & Company, against the whole world, except only the defrauded vendors; and Burns & Company could convey the title to it to whomsover they chose, provided

it was not done in fraud of the rights of their general credi-
tors, and that title would then be good in the hands of the pur-
chaser against all the world except only the defrauded vendor,
or vendors, and assertion of his or their right could not be made
in a proceeding that by statute has been engrafted into and
become a part of a suit wherein the plaintiff, as a general
creditor of Burns & Company, has affirmed its sale of the
flour, and the purchase thereof by Burns & Company and
wherein it now seeks to charge the firm's general assets by a
suit upon the account therefor, aided by the writ of attach-
ment whose only office is to preserve and hold the property
as that of the defendants, that it might be applied in satis-
faction of whatever judgment the plaintiff might obtain on
account of said sale and purchase.

In this character of action the sole contest is, who owned
the flour on the day of the issuance and levy of the writ of
attachment herein.    The interpleader claims it under and by
virtue of the deed of trust made to him by Burns & Company,
on the tenth day of February, 1892, to secure the alleged
indebtedness due to the bank and the Ayr Lawn Company by
said Burns & Company.    The plaintiff claims and asserts and
to recover necessarily must show and prove title to the prop-
erty still in the defendants Burns & Company, notwithstand-
ing the deed of trust; that the deed of trust was made in fraud
of the rights of said plaintiff, and other creditors of said Burns
& Company, and that the property for that reason is, still in
law the property of Burns & Company to satisfy their general
creditors.    No issue as to the fraud in the original purchase
from plaintiff of some undefined and unknown portion of the
general stock of flour conveyed to Piggott can be here made.
In fact, no claim is made that any definite or particular part
or parcel of the flour sold by plaintiff to the defendants Burns
& Company, is included in the property covered by the deed
of trust.    The fact to be determined then is, was the con-

veyance to the interpleader fraudulent against the plaintiff, as a general attachment creditor of Burns & Company, and not whether Burns & Company, or Burns & Company in connection with others participating therein, committed a fraud upon plaintiff in the original purchase of the flour.

By its action upon the account for the flour sold and delivered the appellant has affirmed its sale to the defendants Burns & Company, and it will not now in this suit by attachment on the account, or one growing out of and constituting a part thereof, be allowed to try the case as if it had disaffirmed the sale, and was trying to assert title to the flour by reason of the original fraud that entered into the purchase thereof by Burns & Company, or Burns & Company in conjunction with others.

The two positions are utterly at war with each other, and can not be asserted at one and the same time, in one and the same action. To sustain the latter position, that the flour in controversy was not the property of Burns & Company to dispose of as they might desire, on account of the original fraud (on their part) in its purchase, would be to defeat the original suit on the account for the sale of the flour and necessarily defeat the right of the officer to hold the property by virtue of the writ of attachment issued in aid of said suit on the account.

While the plaintiff on account of the fraud alleged in its answer, might have had either of two remedies against defendants that it chose to pursue, yet those remedies are not concurrent, but separate and distinct, and proceed upon theories antagonistic to and at variance with each other. The one proceeds upon the assertion of the existence of a sale and purchase, the other of a denial thereof on account of fraud. If plaintiff approve the sale he may proceed with his action upon the account, aided by attachment. By disapproving the sale, he may sue for the particular property sold, if same can be found and identified, but the two suits can not be prosecuted

at one and the same time, nor can the joint result of the two suits be realized under the one and the same remedy. Nor do we mean to say or indicate that plaintiff would be confined solely to the two remedies of which we have spoken. If the allegations of its answer filed herein are true, that the bank and the Ayr Lawn Company conspired with and assisted said Burns & Company in the perpetration of the fraud against plaintiffs, for all such resulting injuries, the bank and the Ayr Lawn Company and the defendants Burns & Company, would all be liable to plaintiff in a direct action thereon.

But with that as an additional remedy open to plaintiff, it is wholly unavailing in this action for the claim and delivery of the property in controversy in a suit that by statute has been permitted to be injected into and become engrafted upon plaintiff's suit by attachment upon the account for the purchase price of the flour sold by plaintiff to the defendants Burns & Company.

Again, we can not understand under the facts of this controversy how the plaintiff can be heard to complain of the fraud of Burns & Company, either by themselves or in combination and conspiracy with others, in the purchase of the property herein involved. None of the flour sold by the plaintiff is identified as the flour covered by the Piggott deed of trust. While the statute on fraudulent conveyances was intended for the protection of creditors, to the extent of making void against them, conveyances by their debtor intended to hinder, delay and defraud them in the collection of their debts, still conveyances to debtors are wholly unaffected by that statute. By what right either of statute or at common law can a creditor complain because a debtor fraudulently procured property to be conveyed to himself; because he has become possessed of additional property out of which the creditor may be able to enforce his debt and the debtor to discharge his obligations more readily?

The fact that Burns & Company purchased large quanti-

ties of flour intending at the time not to pay for same is unavailing to the plaintiff in its attachment proceeding except in so far as the fraud was committed against itself.   It would not avail plaintiff in that action to show that Burns & Company had defrauded some one or more of their other creditors, if the act did not at the same time defraud or have a tendency to defraud the plaintiff.   If Burns & Company had not obtained the property in controversy by means either fair or unfair, neither the interpleader suing in behalf of the bank and the Ayr Lawn Company, nor plaintiffs as a general creditor, could assert claim to it for the payment of their debt. It can not therefore be possible that plaintiff as a general creditor of Burns & Company is injured by the debtor having obtained the property in controversy from whatever source or under whatever circumstances acquired, so far as concerns the issues herein involved.   While the obtaining of property by fraudulent means is made one of the grounds for the creditor attaching property in the hands of the debtor under the attachment act, it is of the disposition of property solely, and not its acquisition by the debtor, that the statute against fraudulent conveyances is leveled.

As a second reason assigned by appellant why this case should be reversed, it asserts that there was evidence tending to show that the deed of trust was made in part at least, for the use and benefit of the grantor Burns & Company, and for that reason should have been declared void as to their creditors.   The act complained of under this head is thus stated in appellant's brief.   "The National Bank of St. Joseph permitted Burns & Company to overdraw their account from the 8th day of December, 1891, to the 10th day of February, 1892, to the extent of $8,511.   On the last named date, the date of the deed of trust, the bank took their note for $9,000, and this is one of the notes secured by the deed of trust.   This note overpaid the overdraft and placed to the credit of Burns & Company, $469.   In other words the bank paid this amount

to procure the deed of trust, and Burns & Company used it as they saw fit. · This transaction placed just that amount out of the reach of the other creditors."

In the Mapes case, that was tried upon the same state of facts as are presented here, the Kansas City Court of Appeals, in disposing of the same contention made by appellant here (page 425), say: "If, now, there was any proof that this $469.45, or any considerable portion thereof was paid over to the debtor" (Burns & Company) "then the insistence of plaintiff's counsel would be of some avail—notwithstanding its insignificance when compared with the magnitude of the transactions. . . . . This would be a conveyance to the use of the grantor and void under the statute of fraudulent conveyances." Proceeding with the discussion of the case upon that point the court of appeals, however, disposed of the case adversely to appellant's contention on the facts, using the following language: "But the weakness of this point is manifest from the consideration of other conceded facts and the utter absence of any evidence to prove that Stephen J. Burns received any part of this $469.45." Without detailing the facts and circumstances that led the court of appeals, as this court, to the conclusion, that there was a want of testimony to prove that Stephen J. Burns & Company received the $469.45, or any part thereof placed to their account upon the books of the bank, when the previous overdrafts of Burns & Company from December 8, 1891, to February 10, 1892, at the bank were liquidated by the note for $9,000, made on the day the deed of trust was given, and included therein, as one of the secured debts in favor of the bank, we are disposed to think that even though the facts be considered, as stated by appellants in their brief, that the bank did pay to Burns & Company the $469.45 that was placed to their account on the books of the bank, and that it was paid to procure the execution of the $9,000 note and the deed of trust securing it (and the other notes therein named), and that Burns & Company

used the money for their own benefit, still considering in the light of the surroundings, and of all the conceded and well established facts of the case, the transaction in law was unobjectionable, and the deed of trust to Piggott was not thereby necessarily rendered fraudulent and void as to the general creditors of Burns & Company (of which this plaintiff is one).

In what manner and to what extent did that act withdraw from the plaintiff or the other creditors of Burns & Company, property or money or anything of value, which but for the act they or any of them could have subjected to the payment of their debts in whole or in part? If by the act complained of nothing could have been or was taken from the plaintiff or the other creditors of Burns & Company, but that which Burns & Company had the right to convey to Piggott for the use of the bank and the Ayr Lawn Company, then the act could not be said to fall within the ban of the statute against fraudulent conveyances. A grantor can never be subject to the condemnation of a statute, when he does that which the statute expressly sanctions.

Nor is the act of performance in anywise to be impeached because the creditor was an active agent in bringing about that result, or caused it to be accomplished by a moneyed consideration moving from the bank to Burns & Company, rather than by persuasion or by the voluntary choice of the debtor wholly unsolicited by the preferred creditor. If the right of preference is to be recognized (as it is in this State), then the right to secure that preference by any particular creditor can not be questioned by others, so long as he confines his efforts to the accomplishment of that end, and nothing more. That a creditor can not buy or receive absolutely from the debtor, property free from the claims of other creditors, beyond the limit of value of his indebtedness, is unquestioned; but to that limit, there are no restrictions, and within that limit nothing of value is withdrawn from the creditor that the

law of preference will not approve, or that the statute against fraudulent conveyances will condemn.

Here, as in the Mapes case, the testimony shows that at the time the $469.45 was placed to the account of Burns & Company on the books of the bank as the result of the settlement of the overdrafts, by the giving of the last named note for $9,000 secured by the deed of trust in controversy, the defendants Burns & Company were then actually indebted to the bank and the Ayr Lawn Company in the aggregate sum of $56,530.55, $48,000 of which was evidenced by nine notes of varying dates and amounts, and $8,530.55, on account of overdrafts made by Burns & Company upon the bank, that had been paid by that institution. Now if in the settlement of those overdrafts by note, Burns & Company exacted of the bank as a consideration therefor, a further loan of $469.45 to be included in the note liquidating the overdrafts; or if we consider that the $469.45 placed to the account of Burns & Company on the books of the bank, as a payment made by the bank to Burns & Company, to procure the preferences as obtained by the deed of trust securing the original notes for $48,000, and the last note for $9,000, or as a voluntary gift by the bank to Burns & Company, still that act was not violative of the statute against conveyances for the use of the grantor, in view of the further well established fact in this case that the aggregate of all the property conveyed to the interpleader by the deed of trust in controversy, together with all the other property turned over and assigned direct to the bank and the Ayr Lawn Company by Burns & Company, to secure and pay their said indebtedness, was only about $43,000, $13,000 less than the bank and the Ayr Lawn Company were entitled to have received, not counting the $469.45, and about $4,000 less than they were entitled to recover if we fail to consider the last $9,000 note in which the $469.45 transaction, however considered, was included.

The $469.45 transaction, considered from any point of view that has been suggested by appellant, or as indicated by

the writer, could not possibly have the effect of withdrawing anything from the creditors of Burns & Company.   To give to a debtor property, or to pay him money upon a contract, is not within the prohibition of section 1 of the statute on fraudulent conveyances, forbidding deeds of gifts and conveyances in trust for the use of the grantor, nor can it be said to be the withdrawal of the debtor's property from the influence of his creditors.   To give to a debtor money, to pay to him a debt, but increases his ability to meet his obligations.   It but brings to view for seizure and sale that which previously existed only as a right.   It can do the creditor no harm.

The sole purpose and object of the statute on the subject of fraudulent conveyances is to secure the appropriation of the debtor's property to the payment of his debts; not all of his debts, however, but such part thereof as he can and prefers to pay, else all preferences would be prohibited.   When, therefore, the result of any given conveyance is to appropriate the property conveyed at a fair valuation to the payment of an honest indebtedness or a part thereof, it can not fall within the condemnation of the statute, for, as said above, what the law directly sanctions it will not by indirection condemn.

So long as the entire property conveyed is subjected to the payment of some honest debt of the grantor, the conveyance is honest and lawful.   So long as nothing is taken from the creditors of the grantor, the transaction can not be fraudulent against them, and so long as the property is subject to the payment of an honest debt, it can not be said to be withdrawn from the creditor of the grantor.

It is the property that the debtor conveys or purports to convey, that must give character to the transaction, that must determine whether or not the act falls within the prohibition of the first section of the statute on fraudulent conveyances for the use of the grantor.   It is not claimed that any part of the property included in the deed of trust to Piggott or any of what was turned over or assigned direct to the bank and the

Ayr Lawn Company, or its proceeds, was held for or returned to Burns & Company by Piggott, the bank or the Ayr Lawn Company. On the contrary, the aggregate sum realized from the sale of all the property is inadequate by $13,000 to settle the indebtedness of the bank and the Ayr Lawn Company against the grantor, Burns & Company. If, therefore, the execution of the deed of trust to Piggott by Burns & Company took nothing from the plaintiff and the other creditors, but what by the right of preference was legitimately included therein for the use of the bank and the Ayr Lawn Company; and if the $469.45 transaction viewed in any light possible could not have had the effect, as we have suggested above, how could the two acts combined or considered together have that result.

Appellant makes the further contention that the evidence in the case tended to show that part of the indebtedness secured by the deed of trust to the interpleader was fictitious and for that reason the deed of trust was void and that issue should have been submitted to the jury. This contention is predicated in part upon a statement made by Stephen J. Burns to the effect that he thought he had paid to the bank either a $4,100 or a $6,000 note, during the month of February, 1889, by means of a check drawn upon the bank, and this was followed up by appellant offering an exhibit of the books of the bank, showing the account of Burns & Company with the bank, and in which appellant claims that no payment as that named appears to have been entered to his or the firm's credit. While these two circumstances, if standing alone, undisputed and unexplained, might have been sufficient to have warranted the jury in finding that one of the notes named in the deed of trust had been paid, or at least that one of the number of notes held by the bank and included in the deed of trust should have been credited with that amount, and to that extent treated the debt as fictitious, yet when it is considered that Stephen J. Burns gave that statement as a mere opinion without being

certain as to either the amount of the alleged payment or its exact date, and that he further explicitly stated that the amount of indebtedness due by his firm to the bank and the Ayr Lawn Company on February 10, 1892, at the time the deed of trust to the interpleader was made, was $57,000; and that the notes named in the deed of trust were all for money advanced to his firm by the bank and the Ayr Lawn Company to carry on their business, or in settlement of overdrafts from time to time made by his firm upon the bank, or as renewal of notes previously given for money loaned that had not been paid when due, and that the notes all represented an honest indebtedness at that time due and unpaid, together with the further positive statement of the bank cashier Brittain, and every other witness who testified upon the question as to the amount and genuineness of the indebtedness named in the deed of trust, and with a perfectly satisfactory explanation of the apparent discrepancy in the account as suggested by appellants, the declaration was no statement from which it could be said a jury would have been justified in finding against the honesty of the indebtedness set out in the deed of trust, or that a four or six thousand dollar note, or any part thereof, or either of the other notes named in the deed of trust was fictitious or represented more than was actually due by Burns & Company to the beneficiaries named therein. A finding against the genuineness of the notes, or any of them, on the facts as above indicated, would never have been tolerated, by the court, then why go through the useless form of having the jury return but the one finding that could have the ultimate sanction of law. The trial court therefore committed no error in refusing to submit the case to the jury upon that proposition.

In various ways debit and credit entries in the books of the bank showing its account with Burns & Company, have been manipulated by appellants with a view of discrediting their accuracy and of impeaching in some vague way the

amount claimed to be owing by Burns & Company to the bank, as evidenced by the notes named in the deed of trust in controversy; but in our judgment, without undertaking to detail the account, with its numerous entries, which could not well be set out or easily explained in the compass allowed for an opinion, we do not think that any or all suggestions and insinuations made, when considered along with the explanation made by the bookkeeper of the bank, introduced as a witness by appellants, could be dignified as reasonable suspicions, and much less as facts from which a jury could predicate a finding opposed to the genuineness of the notes.

Appellants urge as a further ground of error on part of the trial court its action in excluding a part of the deposition of Stephen J. Burns relating to a transaction between himself and his daughter and son-in-law, that took place at or near the same time as the executing of the deed of trust in controversy, upon the theory as they contend and argue, that to establish the fraudulent intent it was competent to produce evidence of other fraudulent conveyances made at about the time of the conveyance under consideration. While it may be said that no rule of evidence is better settled in this State now, than the one that permits evidence of fraudulent transactions by the same party of a similar character at or near the same time in order to show the fraudulent intent of the party in the transaction under investigation, the rule has no application to the action of the trial court in excluding that part of the deposition of Stephen J. Burns in this case, for the two-fold reason that (first) the evidence excluded was all to the effect that the transaction between Stephen J. Burns and his daughter and son-in-law were free from fraud and grew out of an honest transaction and had no tendency to prove fraud, and (secondly) there was no evidence or offer of evidence that the interpleader or any one connected with the bank or the Ayr Lawn Company was a party to or in any manner connected with the transactions, which Burns was detailing in his deposition, and

for that reason proof of fraud in those transactions (had any been shown), would have no tendency to show fraud in the transactions between Burns & Company and the bank and the Ayr Lawn Company that led up to and resulted in the making of the deed of trust now in controversy. Suppose the deeds and conveyances made by Burns to his daughter and son-in-law, that were referred to by Burns in that part of his deposition that was stricken out, were confessed frauds upon the right of Burns & Company's general creditors, how would that fact tend to prove that the indebtedness secured by the deed of trust in controversy to the trustee Piggot was not genuine or honest, or that the property given to secure the same was excessive. The intention of the grantor Burns or Burns & Company in making the deed in controversy is a matter not involved in this controversy (so far as affects the interpleader). If the debts are honest, and if the security is not excessive, the intention that prompted the making of the deed can in no wise affect the question of its validity or its invalidity in a controversy with other creditors.

The only effect of such testimony would have been to have confused the mind of the jury with irrelevant matter, and the trial court acted properly in excluding it from their hearing.

Complaint is also made by appellant to the action of the trial court in refusing to permit it to use a transcript of the evidence of Calvin F. Burnes previously taken in the case of Bowersock v. Stephen J. Burns & Company, in the Clinton Circuit Court, the witness Burnes having been shown, at the time of giving his testimony in that case, to have been president of the beneficiary bank named in the deed of trust in controversy. We fail to see from the transcript of the testimony offered how it could have in any wise been beneficial to appellants; but considering it as containing according to appellant's contention, a detrimental admission to the claim of the bank, as to one of the notes secured by the deed of trust under which

the interpleader claims the property in suit for the use of the bank and the Ayr Lawn Company, the transcript of the testimony was still inadmissible as evidence against the bank in this action. Neither the bank or Calvin F. Burnes was a party to the issues on trial in that case and the statements then made by him, if any, detrimental to the present contention of the interpleader, for the bank, could not be said to have been made by him as agent for the bank, but in answer to the compulsory process of the court that required his presence and commanded his answers. Neither the voluntary statement of an agent or officer of a corporation acting outside of and beyond the duties of his agency, or those exacted and not afterwards ratified by the corporation, can be held and treated as declarations or admissions binding upon the corporation in a suit afterwards between the corporation and a stranger. The actions of the trial court in refusing to permit the transcript of the testimony of Calvin F. Burnes taken in the Bowersock case to be read in the case was proper, and appellant's complaint on account thereof is not well made. Other assignment of error has been made by appellants which we have carefully examined, but do not think a discussion of them necessary here, for a proper determination of this appeal.

The judgment of the trial court will be affirmed. All concur.